UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Case No.:   2:22-CR-191 |
| | ) | |
| | ) | **MOTION TO SUPPRESS** |
| vs. | ) | |
| | ) | |
| **ANTHONY JAMES** | ) | |

The Defendant, Anthony James, by and through his undersigned attorney, hereby moves this Court to suppress the fruits of the stop, search and seizure which resulted in the indictment in this case, on the grounds that such evidence was obtained in violation of the Defendant's rights under the Fourth Amendment of the United States Constitution.

**I.     Statement of Facts**

Just after midnight on December 1, 2022, Anthony James was driving a 2016 Ford Escape on Sam Rittenberg Blvd. in Charleston, South Carolina.  Officer Cody Daniels of the City of Charleston Police conducted a traffic stop at 1812 Sam Rittenberg Blvd. for "Malfunctioning Equipment."  Ex. A, Incident Report.  Officer Daniels claimed that James had been driving with his nighttime taillights on, in violation of South Carolina traffic law.

Officer Daniels was wearing a body-worn camera that captures most of his actions on scene that night.  Ex. B. The video from the camera did not capture the taillights while the car was in motion. However, it appears from the body-worn camera that the taillights were illuminated when Daniels approaches the car to speak with James.  Ex. B at 00:17 – 00:43.[1]

---

[1] All times referenced are to the time of the video file and not to the time

The City of Charleston Police Department claims that Daniels' vehicle was not equipped with a dashboard camera.[2]  As such, there is no evidence to corroborate Daniels' claim that James' taillights were not functioning.

Other officers arrived on scene to assist Daniels, including Officer Edgren.  He was also wearing a body camera during the stop.  See Ex. C.  Officer Edgren's body camera captures images of the interior of James' car.  Edgren's body camera captures the lighting control dial for James' car.  Ex. C at 6:06.  A screenshot is attached as Ex. D.

The screenshot and video show that the dial controlling the exterior lighting is turned all the way to the right.  This is the automatic lighting function on a 2016 Ford Escape, the type of car James was driving.  See Ex. A, p. 5.  When the dial is turned to the automatic function, the headlights and taillights automatically illuminate.  See Ex. E, pages from the 2016 Ford Escape Manual.[3]  This evidence corroborates Daniels' body camera footage that James' taillights were actually on when he was pulled over.

After going to his cruiser for a few minutes and calling for backup, Daniels returned to James' car.  He claimed that he smelled marijuana and gave this as a justification for pulling James out of the car and to "do a quick search." Ex. B at 06:20. After pulling James out of the car, Officer Edgren saw a baggie of what he believed to be marijuana on the floorboard of the car.  Mr. James was handcuffed, and then asked if he had a weapon on him. Ex. B. at 07:00 – 08:00. He

---

listed on the body camera video itself.  Exhibits B and C will be provided to the Court under separate cover.
2 The Defendant subpoenaed the Department seeking this footage.  The police department responded that Officer Daniels' police car was not equipped with a dashboard camera.
3 The full owners manual can be found at https://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2016-Escape-Owners-Manual-version-2_om_EN-US_11_2015.pdf.

admitted to having a gun on his person, and Daniels found a handgun in James' jacket. Officers also found a black plastic bag next to the baggie of marijuana on the floorboard of the driver's seat area of the car. This bag was later opened and contained a scale, baggies, and drugs.

James was then questioned about the gun and drugs. Before he answered these questions, James was read his *Miranda* rights. Ex. B at 10:00. James admitted to possession of the gun for personal protection, but he denied knowledge about the marijuana and other drugs found in the car.

## II.     Statement of Law

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U. S. Const. amend IV. This right limits the power of law enforcement officers to conduct searches of places in which a person has a legitimate expectation of privacy. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). Warrantless searches are per se unreasonable unless the search falls within a valid exception. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Because warrantless searches are presumptively unlawful, the burden of proving that one of the valid exceptions to the warrant requirement has occurred, as well as the overall burden of proof, rests with the government. *United States v. Jeffers*, 342 U.S. 48 (1951).

Initially, the defendant must show that there was no warrant for the search or arrest. In this case the police officers did not have a warrant to stop, arrest or search the Defendant or the car. Therefore, the government must show by a preponderance of the evidence that the warrantless search was justified under one of the narrow exceptions to the rule requiring a search warrant. *Chimel v. California*, 395 U.S. 752 (1969). If the government alleges that the defendant

consented to the search, it also has the burden of proving such consent. *Bumper v. North Carolina*, 391 U.S. 543 (1968). The Defendant denies that he gave consent.

To stop someone, even for investigatory purposes, an officer must possess "a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119 (2000). Temporary detention of individuals during a traffic stop by the police, even if only for a brief period and for a limited purpose, is a seizure. *Whren v. United States*, 517 U.S. 806, 809 (1996). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id.*

### III.  Argument

#### A.  *There was no reasonable suspicion nor probable cause to stop the car.*

Daniels claims that he pulled the car over because it did not have its taillights on. The video from Daniels' body camera shows otherwise. Because James' car had proper illumination, Daniels had no authority to stop his car. As such, the drugs in the car and the gun on James' person should be suppressed.

#### B.  *Daniels claim that he smelled the odor of marijuana does not provide probable cause to search James.*

The odor of marijuana has historically provided police officers with probable cause to search a person or a car in which a person was driving. See *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016). However, a change in the law about how marijuana is defined must provoke a reconsideration of whether an officer's claim to smell the "odor of marijuana" still provides probable cause to search a person or his car.

It is time for the courts to ignore police officers' claims that they smell marijuana as some

sort of talisman that excuses illegal stops, searches, and seizures.   Additionally, the courts must reexamine the legal effect of an officer's claim that he smells the "odor of marijuana" in light of significant changes in the law surrounding marijuana and its twin sister hemp.

This case highlights the ease with which officers can use the talismanic canard of the "odor of marijuana."   Not all Courts have countenanced the "odor of marijuana" talisman as a legitimate reason for law enforcement to stop and search citizens.   One judge in New York has even called the use of the term a "canard."   See Exhibit F.

1. Daniels could not have smelled the marijuana.

First of all, the claim that Daniels smelled the odor of marijuana is not supported by the evidence in the case.   The only marijuana located was found in a bag in the driver floorboard.   As a short review of the video shows, the night James was pulled over was incredibly windy.   It is difficult to believe that any officer could smell the "odor of marijuana" given the marijuana packaging, the bag's location, the officer's distance from it, and the high winds.

2. A shifting legal landscape

Even if the Court finds credible Daniels' claim that he smelled the "odor of marijuana," recent changes in the law should give the court considerable pause before allowing the "odor of marijuana" to qualify as a justification to remove James from the car and search him.   The legal landscape has shifted significantly around the country and in South Carolina regarding marijuana and its closely related sister plant, hemp.

Most states have legalized marijuana for medicinal or recreational use.[4]   Although South Carolina has not (yet) legalized medicinal or recreational marijuana use, it has decriminalized the

---

[4] See https://en.wikipedia.org/wiki/Legality_of_cannabis_by_U.S._jurisdiction (last visited 08/18/2022).

possession of hemp and the use of cannabidiol (CBD) products.  See the South Carolina Hemp Farming Act at S.C. Code Ann. §§ 46-55-10 through 46-55-60. The federal government has also legalized the possession and use of hemp and related CBD products.  See 21 U. S. C. § 802(16) (2019); Agricultural Improvement Act of 2018 Pub. L. No. 115-334, 132 stat. 4490; Agricultural Act of 2014 Pub. L. No. 113-79, § 11009, 128 stat. 649.

Hemp and marijuana are "varieties of the same species, Cannabis sativa L."[5]  The main difference is the level of the psychoactive compound cannabinoid delta 9 tetrahydrocannabinol, or THC.[6]  It is fair to assume that the odor of hemp could be easily mistaken for the odor of marijuana. The inability to distinguish between the "odor of hemp" (a legal substance to possess) and the "odor of marijuana" has prompted concern from many law enforcement areas across the country about the ability of officers to search based upon the "odor of marijuana."  See Exhibits G-I.  In short, how does an officer in South Carolina discern the difference between the smell of the legal possession and use of hemp and the illegal possession and use of marijuana?  He cannot.

This shifting legal landscape in regards to marijuana and hemp requires this court to reexamine the precedents that generally have upheld stops and searches based upon the "odor of marijuana."  Marijuana no longer has a distinct smell that indicates that illegal activity is going on or has been going on.  As such, it can no longer serve as a basis for probable cause to search citizens or their cars.

---

5 Gero Leson et al., *Evaluating the Impact of Hemp Food Consumption on Workplace Drug Tests*, 25 J. of Analytical Toxicology 691, 692 (Nov. /Dec. 2001); accord *The Health Effects of Cannabis and Cannabinoids: The Current State of Evidence and Recommendations for Research*, National Academies of Sciences, Engineering, and Medicine, at * 38 & n.6 (2017), available at https://doi.org/10.17226/24625.

6 *See Evaluating the Impact of Hemp Food Consumption*, at 692.

### IV.     <u>Conclusion</u>

The Defendant challenges the seizure of the evidence in this case because his rights were violated at two particular time periods. First, the initial traffic stop was not supported by reasonable suspicion. Second, there was neither reasonable suspicion nor probable cause to remove James from the car and to search him. An officer's claim to smell the "odor of marijuana" no longer provides evidence that illegal activity is afoot.

For these reasons, the Defendant seeks an order from the Court suppressing the gun and drugs found in his car or on his person.

Respectfully submitted,

*/s/ Cody J. Groeber*
Cody J. Groeber, Esquire
Assistant Federal Public Defender
145 King Street, Suite 325
Post Office Box 876
Charleston, SC 29402
Attorney ID# 12186

August 26, 2022